[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 09-11658

_____

D. C. Docket No. 04-00917 CV-J-32JRK

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 20, 2010
JOHN LEY
CLERK

JEREMIAH THOMAS,
MICHAEL MCKINNEY,

Plaintiffs-Appellees,

versus

RANDALL BRYANT,
in his official capacity,
WALTER A. MCNEIL,
Secretary, Department of Corrections,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 20, 2010)

Before BLACK, HULL and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This appeal presents important questions concerning the intersection of the

Eighth Amendment and the incarceration of inmates with serious mental illness.

Ten inmates incarcerated at Florida State Prison ("FSP") brought this § 1983 action against various officers and employees of the Florida Department of Corrections ("DOC"), alleging that the use of chemical agents on inmates with mental illness and other vulnerabilities violates the Eighth Amendment's prohibition on cruel and unusual punishment. After the plaintiffs settled their damages claims against the individual correctional officers responsible for administering the chemical agents, the district court held a five-day bench trial on their remaining claims for declaratory judgment and injunctive relief against the two defendants allegedly responsible for the policy which authorized the use of chemical agents on inmates at FSP: Walter McNeil, Secretary of the DOC, and Randall Bryant, Warden of FSP. The district court entered judgment in favor of two of the remaining six plaintiffs,[1] concluding that the repeated sprayings inmates Jeremiah Thomas and Michael McKinney received pursuant to the DOC's non-spontaneous use-of-force policy violated the Eighth Amendment. Specifically, the district court concluded that Thomas and McKinney demonstrated that at times in which they were sprayed with chemical agents they were unable to conform their behavior to prison standards due

_____

[1] By the time of trial, four of the original ten plaintiffs had been dismissed from the suit.

2

to their mental illnesses such that the DOC's use of force for purposes of prison discipline amounted to cruel and unusual punishment. To remedy the violation, the district court permanently enjoined the defendants, in their official capacities, from allowing the non-spontaneous use of chemical agents on Thomas or McKinney without first consulting with the DOC's trained mental health staff to evaluate their mental health status. Defendants McNeil and Bryant now appeal, challenging both the district court's finding of an Eighth Amendment violation and the propriety of its permanent injunction.

Four days before oral argument, in an unfortunate twist of events, plaintiff Thomas died in DOC custody. Pending before our court is a timely motion for substitution filed by Thomas's father, Maxime Jerome Thomas, to substitute his son's interest in this suit. See Fed. R. App. P. 43(a) (providing for substitution of a deceased party on appeal). Both parties agree that Thomas's death renders moot the declaratory and injunctive relief awarded him by the district court. "Where a case becomes moot after the district court enters judgment but before the appellate court has issued a decision, the appellate court must dismiss the appeal, vacate the district court's judgment, and remand with instructions to dismiss as moot." Bekier v. Bekier, 248 F.3d 1051, 1055–56 (11th Cir. 2001) (citing United States v. Ghandtchi, 705 F.2d 1315, 1316 (11th Cir. 1983)).

However, although Thomas's death deprives us of jurisdiction to determine the merits of his Eighth Amendment claim and the district court's award of his injunctive relief, "[w]hen plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still 'prevailing parties' for the purposes of attorney's fees for the district court litigation."[2] Diffenderfer v. Gomez-Colon, 587 F.3d 445, 454 (1st Cir. 2009). We thus hold that Thomas may still be a "prevailing party" entitled to attorneys' fees for the costs of the district court litigation notwithstanding his untimely death and the subsequent mootness of his lawsuit pending appeal.[3] Accordingly, we vacate the district court's judgment and permanent injunction as to Thomas but grant the pending motion for substitution in order to allow the district court to resolve Thomas's motion for attorney's fees. The district court, in its discretion, may award fees to Thomas's estate if it determines that Thomas "succeeded on any significant issue in litigation which achieved some of the

---

[2]      The other circuit courts of appeals to address this issue have held the same. See UFO Chuting of Haw., Inc. v. Smith, 508 F.3d 1189, 1197 & n.8 (9th Cir. 2007); Dahlem v. Bd. of Educ. of Denver Pub. Sch., 901 F.2d 1508, 1512–13 (10th Cir. 1990); Palmer v. City of Chicago, 806 F.2d 1316, 1321 (7th Cir. 1986); Grano v. Barry, 783 F.2d 1104, 1109 (D.C. Cir. 1986).

[3]      We note, however, that where, as here, a controversy is mooted before a Court of Appeals issues a judgment, a party cannot be considered a "prevailing party" at the appeals stage, so as to recover attorneys' fees for the cost of appellate litigation under § 1988's fee-shifting statute. Lewis v. Cont'l Bank Corp., 494 U.S. 472, 483, 110 S. Ct. 1249, 1256 (1990).

4

benefit the parties sought in bringing suit." Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791–92, 109 S. Ct. 1486, 1493 (1989) (internal citation and quotation omitted).

Our review of the instant suit is thus limited to the remaining live controversy between the defendants and plaintiff McKinney. Our task is to determine whether the district court erred in concluding that the DOC's non-spontaneous use-of-force policy, as applied to McKinney, violates the Eighth Amendment and whether its permanent injunction was both necessary to remedy the violation of McKinney's rights and also properly tailored to the identified harm. Finding no error in the district court's thorough conclusions of law and narrowly tailored injunction, we affirm.

## I. BACKGROUND

In September 2008, after four years of litigation, the district court held a five-day bench trial on the plaintiffs' claims for declaratory judgment and injunctive relief. At trial, the district court had the benefit of hearing live testimony from thirteen lay and expert witnesses, the majority of which were officers and medical and mental health experts currently or formerly employed by the DOC.[4]

---

[4] The parties proffered the testimony of an additional twelve witnesses, who were also predominantly DOC officers and employees, via deposition and affidavit.

The district court also had the opportunity to view numerous exhibits, including video recordings of specific incidents in which DOC officers sprayed McKinney and other plaintiffs with chemical agents. After trial, the district court entered a 75-page order in which it made extensive findings of fact and conclusions of law based on this evidence, which is reported in Thomas v. McNeil, No. 3:04-cv-917-J-32JRK, 2009 WL 64616 (M.D. Fla. Jan. 9, 2009). The first fifty pages of that order are dedicated to factual findings.

The defendants' appellate briefs do not expressly challenge any of these findings as clearly erroneous on appeal, and the defendants conceded at oral argument that they only intend to appeal the district court's legal conclusions.[5] Thus, we adopt the district court's uncontested factual findings as our own. For a comprehensive summary of the facts underlying this case, as well as a detailed chronology of Michael McKinney's individual inmate record, we refer the parties and future litigants to the district court's opinion. See id. at *1–20. For purposes of this opinion, we recite only those facts essential to our disposition of this appeal,

_____

[5]    However, the district court's legal conclusions are premised on additional factual findings contained in the last twenty-five pages of the district court's opinion. These factual findings concern whether the record evidence demonstrates that McKinney was no longer able to conform his behavior to prison standards due to his mental illness and whether the record demonstrates the necessary culpability of the defendants to find an Eighth Amendment violation. The defendants repeatedly challenge these factual findings throughout their appellate briefs and do not appear to have conceded these issues at oral argument. We address these factual findings separately in Parts III.B.i. and III.B.ii.

supplementing with additional facts contained in the record where necessary.

    A.    <u>Florida State Prison and the DOC's Non-Spontaneous Use-of-Force Policy</u>

At issue in this appeal is the constitutionality of the DOC's non-spontaneous use-of-force policy as applied to McKinney during his incarceration on a close-management wing of FSP. FSP is a maximum security prison in Starke, Florida, that houses a large population of inmates with serious mental illness. <u>Id.</u> at *2. Close management refers to the administrative segregation of those inmates who demonstrate particular difficulty complying with day-to-day prison regulations. <u>Id.</u> Each close-management cell is a completely enclosed nine-by-seven foot single cell, fortified with a solid steel door and containing a small window and a "food flap" for passing food, medication, and other items to the inmate. <u>Id.</u> The DOC's non-spontaneous use-of-force policy permits corrections officers to release chemical agents, typically pepper spray, through the food flap of these cells as a means of disciplining disruptive prisoners who refuse to comply with prison regulations.[6] <u>Id.</u> at *2–3.

_____

[6]    The DOC's non-spontaneous use-of-force policy as contained in the trial record states:

(m) Procedure for the use of chemical agents on disruptive inmates under controlled conditions:

1. If an inmate becomes disorderly, disruptive, unruly, and attempts by officers at

counseling and ordering the cessation of disruptive behavior fails, the confinement or close management lieutenant or shift supervisor or person of higher rank shall be contacted for further instructions.

2.  If the confinement or close management lieutenant or shift supervisor's efforts to control the disorderly inmate have failed and the use of chemical agents is the least level of force that can be expected to successfully gain control of the disruptive inmate while minimizing the risk of injuries to all involved, the shift supervisor shall: . . .

a. When in a close management or confinement setting, review Form DC4-650B, Risk Assessment for the Use of Chemical Agents and Electronic Immobilization Devices, to determine if the inmate has a medical condition that would be exacerbated by the use of chemical agents . . . or contact medical staff to determine whether the inmate has any medical condition that would make the use of chemical agents dangerous to that inmate's health . . .

b. Contact the warden, or, in his or her absence, the duty warden and request authorization to utilize chemical agents.

3.  Prior to using chemical agents, the inmate again shall be counseled with by the shift supervisor concerning his behavior.

a.  If this attempt to counsel with the inmate is unsuccessful, the inmate will be given a final order by the shift supervisor to cease his actions.  The inmate will also be informed at this time that chemical agents will be administered if he continues his disruptive behavior.

b.  If the inmate continues his disruptive behavior, approximately three minutes after the order is given, staff are authorized to administer chemical agents in the form of no more than three one-second bursts. . . .

c.  If after approximately five minutes from the initial exposure the inmate still continues his disruptive behavior, staff are authorized to again administer chemical agents for no more than three one-second bursts.

d.  If the second administration of chemical agents fails to control the inmate's disruptive behavior, the duty warden shall again be consulted to determine the next course of action.  Additional actions include:

I.  Additional administration of the same type or other type of chemical agent; and

Pursuant to this policy, corrections officers may administer chemical agents in three one-second bursts into the cell of a recalcitrant inmate in order to force the inmate to comply with the officer's orders and to quell the underlying disturbance. Id. at *2.  Non-spontaneous force, as the name implies, is premeditated force, i.e., force that is only available as a disciplinary tool after corrections officers have complied with a series of preliminary procedures.  These procedures include the requirement that an officer first confer with a direct supervisor, DOC medical personnel (though not mental health staff), and the Warden of FSP for

---

II.  Other uses of force as authorized by this rule. . . .

(n) Medical Requirements.  Once the inmate is compliant, he shall be showered as soon as possible but not later than 20 minutes after final application of chemical agents.  The inmate shall be examined by medical staff immediately after showering. . . .

1.  If an inmate refuses to shower or change, the refusal shall result in a disciplinary report and be documented . . . .

2.  In the event the inmate refuses to shower or change, staff shall advise the medical staff member who is responsible for examining the inmate following the use of force of this refusal and medical staff shall immediately report to the area to conduct a cell-front examination and to explain the importance of showering after exposure to chemical agents, except in case of emergency which shall be documented.

3.  The shift supervisor shall again order the inmate to shower.  If the inmate refuses again, this refusal shall also be documented in writing and witnessed by the shift supervisor and medical staff.

4.  If medical staff determine that there is no immediate medical need for the inmate to shower, then for the next 2 hours the inmate shall be checked every 30 minutes and given the opportunity to shower. . . .

9

authorization to use chemical agents in the particular instance on the specific inmate at issue. Id. at \*3. In contrast, spontaneous force is available to corrections officers as an immediate means of controlling emergency disturbances such as prison riots, acts of self-mutilation, or threats of violence, which pose imminent harm to an inmate or an officer. Id. at \*2 n.10. The use of spontaneous force at FSP is not at issue in this case.

Inmates in DOC custody receive a mental health classification, ranging from S-1 to S-6, upon entry into the system. Id. at \*2. An S-3 classification is the highest-needs mental health classification that the DOC confines in a regular prison setting and at FSP. Id. S-3 inmates are prescribed psychotropic medications to regulate some moderate impairment in adaptive functioning due to serious mental illnesses such as schizophrenia, bipolar disorder, major depression, or schizotypal or borderline personality disorders. Id. The DOC's non-spontaneous use-of-force policy applies equally to all inmates housed at FSP, regardless of their mental health classification. Accordingly, all inmates on FSP's close-management wings, including S-3 inmates diagnosed with serious mental illness, are subject to the application of chemical agents if they cause a disturbance or violate prison rules. Id. Prison rules governing FSP and other close-management wings prohibit banging or yelling from inside a fully-secured cell because such a disturbance may

10

incite or disturb other inmates or prevent security from hearing an inmate in need. Id.

Inmates with higher S-grades are confined to therapeutic prison settings or psychiatric hospital facilities where they are not subject to the DOC's non-spontaneous use-of-force policy. Id. One such facility is Union Correctional Institution ("UCI"), a DOC prison focusing on inpatient psychiatric care that houses S-3, S-4, and S-5 inmates and is adjacent to FSP. Id. at *5. At UCI, officers first respond to disturbances such as banging and yelling from within a cell by contacting mental health staff for counseling and medication adjustments as necessary. Id.

The district court heard significant trial testimony about the relationship between FSP and UCI and what both parties referred to as the "frequent-flier" syndrome. Frequent-fliers are those inmates who are cyclically shuttled back and forth between FSP and UCI when their mental illnesses become more active and their symptoms more pronounced, a phenomenon referred to at trial as "decompensation." Id. at *4–8. Transfers to UCI often result in the reclassification of these inmates' S-grade, intensive crisis stabilization, and an increase in or modification of their psychotropic medications. Id. at *6; 15–17. Once these inmates are stabilized at UCI, they are returned to FSP, often to begin the cycle of

11

decompensation anew. Id. at *6.

The district court found that record testimony on the frequent-flier syndrome demonstrated that "an inmate's mental health designation may transition from one level to another" and that "[t]his transition may be gradual or sudden." Id. "When an S-3 inmate experiences this transition—decompensates—he may become confused, disorganized and disoriented, impacting his ability to follow orders because he has become preoccupied with internal thoughts and is rendered incapable of understanding or conforming to demands." Id. Thus, the district court found that "the record supports that there are (or at least have been) [close-management] inmates at FSP for whom the S-3 designation is no longer appropriate," id. at *8, and that "some S-3 inmates manifest symptoms of mental illness which are indistinguishable to security staff (and sometimes even to mental health staff) from behaviors which appear to be willful recalcitrance," id. at *24. Various witnesses testified that based on their observations some of these decompensated inmates have been sprayed with chemical agents for behaviors consistent with their mental illnesses, such as banging and yelling.[7] Id. at *5.

---

[7] Dr. Olga Infante, a treating psychiatrist who worked at FSP and UCI from 1999 through 2005, testified that "banging and yelling are behaviors that might signal an exacerbation of the mental illnesses from which S-3 and S-4 inmates can suffer, such as the bipolar component of those suffering from schizoaffective disorder." Thomas, 2009 WL 64616, at *5. Dr. Tuong Nguyen, former medical director at UCI and FSP, agreed that the frequent-flier phenomenon demonstrated that inmates "were being gassed with chemical agents at FSP for behavior that was

12

The district court also made significant factual findings regarding the effects of chemical agents on inmates with mental illness. The district court found that the use of chemical agents on FSP inmates may cause both physical and psychological injury beyond the short-lived intense physical pain, burning and gagging sensations, and disorientation intended by their proper use.[8] Id. at *4. The district court found that further physical injury may occur "when ventilation is limited, when proper decontamination procedures are not timely followed, or when the person sprayed has a particular sensitivity to the product," and testimony established that these problems with the administration of chemical agents were

consistent with their diagnosed mental illnesses." Id. at *7. The plaintiffs also introduced into evidence the 2005-2006 Annual Report by the Florida Correctional Medical Authority ("CMA"), an independent agency created by the Florida legislature to monitor health care in the state's prisons, which stated that "mentally ill inmates may suffer symptoms that result in behaviors such as yelling incessantly, refusing to obey orders or lashing out without provocation and may have difficulty following the strict rules of a prison setting." Id. at *8. Although the defendants put forth testimony by Dr. Peggy Watkins-Ferrell, FSP's lead senior psychologist since 2003, that inmates are not being sprayed with chemical agents for behaviors which are simply uncontrollable symptoms of their mental illness, the district court emphasized that when the DOC performs mental competency evaluations following the use of force in order to determine whether the inmate should be subject to further disciplinary action for the disturbance causing the incident, these evaluations sometimes find that the inmate was not competent at the time he was sprayed. Id.

[8] For example, the CMA, in its 2003-2004 annual report, expressed continuing "significant concern" that chemical agents were being inappropriately used on inmates in close management or confinement settings at DOC facilities resulting in serious medical consequences including serious chemical burns and the exacerbation of mental health symptoms, which in one instance led to an inmate's suicide. Thomas, 2009 WL 64616, at *8.

13

present at FSP.[9]  Id.  The district court also found that "[i]t is clear from [the] record that psychological injuries may also be suffered by exposure to chemical agents," which may include, as described by the plaintiffs' correctional mental health expert Dr. Kathryn Burns, "feelings of intense helplessness, fear of dying, attempts at suicide and exacerbation of other symptoms of mental illness."  Id. These uncontested factual findings form the backdrop from which the district court viewed, and we now view, Michael McKinney's individual record.

B.    Michael McKinney's Inmate and Mental Health Records

McKinney's inmate record and mental health files indicate the following. McKinney has been incarcerated in various DOC facilities for almost his entire adult life.  Id. at *14.  He began serving his current life sentence for attempted first degree murder in 1989, at the age of 20.  Id.  His DOC inmate file reports that at age 16 he was identified as having only marginal intellectual functioning and propensities for anger and anti-social behavior.  Id.  By 2007, McKinney had over 320 disciplinary reports and a record the DOC's psychological assessment team

---

[9]    For example, the DOC's non-spontaneous use-of-force policy requires that corrections officers offer inmates sprayed with chemical agents a decontaminating shower to remove any chemical residue from an inmate's skin and clean the inmate's cell, bedding, and clothing following a use-of-force incident.  Thomas, 2009 WL 64616, at *3.  However, inmates frequently refuse to submit to handcuffing to be taken to the shower after being sprayed and thus are not properly decontaminated, which can result in severe burns on the affected areas of skin. Id. at *3, *13.

referred to as "pathological." Id. Throughout the course of his incarceration, McKinney has been diagnosed with various serious mental illnesses, including an adjustment disorder with a depressed mood, antisocial personality disorder, and major depression with recurrent psychotic ideations. Id. McKinney has a history of self-injurious behavior, including head banging, self-inflicted lacerations, drug overdoses, setting fires in his cell, and suicide attempts.

Between the years 2001 and 2007, McKinney was sprayed with chemical agents 36 times pursuant to the DOC's non-spontaneous use-of-force policy for banging, kicking, yelling, throwing feces, or refusing to remove his arm from the food flap in his cell.[10] Id. at *15–17. During this same time period, he was transferred to UCI ten times for ongoing treatment and to the FSP infirmary seven times for various psychological emergencies or short-term psychiatric care, some of which resulted in his ultimate transfer to UCI. While housed at FSP, McKinney was consistently classified as an S-3 inmate.[11] While in treatment at UCI, he was reclassified at a higher S-grade on at least two occasions, once as an S-5 inmate in March 2003 and once as an S-4 inmate in July 2007. Since July 31, 2007,

---

[10] Earlier records of such incidents are not in McKinney's file. Thomas, 2009 WL 64616, at *15.

[11] There is some indication that McKinney was briefly classified as an S-2 inmate at some point during his years at FSP but not that this classification corresponded with any of the use of force incidents relevant to this action.

15

McKinney has been incarcerated at UCI.

While McKinney's record demonstrates substantial periods in which he appeared to adjust relatively well to prison life at FSP, it is also full of many periods in which he chronically violated prison rules, experienced serious psychological emergencies, and suffered from frequent chemical sprayings. Significantly, many of these chemical sprayings followed close on the heels of incidents demonstrating that his mental health status was deteriorating. Additionally, many of these chemical sprayings immediately preceded McKinney's transfer to UCI or FSP's infirmary.

The year 2002 demonstrates the seriousness of McKinney's mental illness and his difficulty coping with life on the close-management wing. That year he was sprayed with chemical agents six times for yelling, kicking, and/or beating on his cell door. Id. at *15. On August 21, a few weeks after the last of the six sprayings, McKinney attempted to hang himself in his cell. Id. The DOC responded by sending him to the FSP infirmary with a diagnosis of major depression, where he remained until September 16 when he was transferred to UCI for three months of stabilization and treatment. Id. After he was released from UCI on December 16, McKinney only spent two days on his FSP wing until he returned to the FSP infirmary where he was diagnosed as suicidal, homicidal,

16

bipolar, and psychotic.  Id.  He was released again to his wing only to return to the infirmary again for eight more days of treatment.  Id.  His third return to his wing also failed; after three days, he returned to the infirmary for the entire month of January 2003.  Id.

We see similar evidence of McKinney's psychological distress in the period from March to August 2003, as well as a close temporal relationship between the use of chemical agents and his transfers out of FSP's close-management wing. During this period, McKinney was sprayed with chemical agents five times.  On March 5, he was sprayed with chemical agents on two separate occasions for yelling obscenities and kicking and beating on his cell door.  Id.  The following day, McKinney was found in his cell engaging in the unusual behavior of standing on and jumping off of his cell sink.  Id.  FSP doctors ordered corrections officers to use force to restrain him from continuing this behavior, and McKinney was transferred to the FSP infirmary's isolation cell where he remained for a week before being transferred to UCI on March 13.  Id.  At UCI, McKinney was reclassified from S-3 status to S-5 status and received inpatient treatment to re-stabilize his mental illness.  Id.  On May 25, during his treatment at UCI, McKinney set fire to his cell.  Id.  Subsequently, on May 29, after spending several days at UCI's infirmary, UCI correctional staff sprayed McKinney with chemical

agents in response to a disturbance in which he was screaming and making threats of hurting himself.[12] Id. McKinney returned to FSP on June 6. Id. Only ten days later, he was sprayed with chemical agents, again for yelling obscenities and kicking and banging inside his cell. Id. One month later, on July 15, he was again sprayed for the same behavior, and he was transferred to the FSP infirmary the following day. Id. From the infirmary, McKinney was transferred back to UCI for psychiatric observation and treatment until August 7, 2003. Id. Treatment notes from this stay at UCI report that McKinney stated that he "is doing well coping while here but does not know how he will cope at FSP because he believes he has to be on guard against unwarranted gassings." Id.

McKinney's most serious incidents of self-injurious behavior occurred in October of 2003. This period illustrating McKinney's psychological distress, the use of chemical agents, and his transfer out of FSP for inpatient treatment began on October 6 when he declared a mental health emergency and told a psychological specialist he was going to hurt himself. Id. The following day, McKinney threw feces at an officer, to which corrections officers responded with the use of chemical

___

[12] According to record testimony, the use of chemical agents at UCI for a mere disturbance, such as yelling and screaming, would be a deviation from standard practice. Thomas, 2009 WL 64616, at *15 n.33. It is possible that McKinney's threats of self-inflicted injury caused UCI staff to deem force necessary; however, the record is unclear as to whether such an assessment was made or the reason behind the decision to use force. Id.

agents.  Id.  Later that same day, McKinney refused to submit to restraints so officers could search his cell, resulting in a cell extraction.[13]  Id.  That evening, McKinney was sprayed with chemical agents again for yelling and kicking in his cell.  Id.  Four days later, on October 11, McKinney again refused to stop yelling and kicking in his cell and was sprayed with chemical agents for the third time in five days.  Id.  On October 13, two days later, correctional officers found McKinney banging his head on his steel bunk and cell door, which resulted in injuries requiring treatment at the FSP emergency room and his subsequent transfer to UCI.  Id.  Treatment notes from this period indicate that McKinney "was having problems with staff spitting in his food and gassing him and he believes this will always be the same" and that "they gas him . . . even if he does nothing." Following two weeks of treatment, McKinney returned to FSP, only to be admitted back to the emergency room two days later after jumping down a flight of eight stairs, head-first.  Id.  The laceration he sustained on his head from the incident required seven staples to close, and McKinney reported that he wanted to kill himself.  Id.  He remained in treatment until November 2003.  Id.

After this period, fewer incidents of such extreme psychological trauma

---

[13]    In a cell extraction, a team of five correctional officers enter an inmate's cell and forcibly restrain and remove him.  Thomas, 2009 WL 64616, at *2.  Cell extractions used to be the DOC's primary method of gaining an inmate's compliance with an order until 1999 when an inmate, Frank Valdes, died at FSP as a result of this practice, likely due to severe beating.  Id.

occurred, but McKinney's mental health record continued to demonstrate that he was at risk for suicide and self-injury. For example, from early February to early March 2004, McKinney was sprayed with chemical agents four times, and outpatient therapy reports indicate that he was adjusting poorly to confinement and experiencing suicidal ideations. Id. Treatment notes record that McKinney was being referred to psychiatry for assessment of his suicide and self-harm risk and include the following statement demonstrating McKinney's fear of chemical sprayings: "I need to be alert they gas me so often."

Similarly, in June 2004, McKinney was sprayed with chemical agents and then transferred to the FSP infirmary the next day for a psychological assessment. Id. at *16. McKinney consented to inpatient treatment at this time, admitting, "I can't help myself." Id. McKinney remained in the infirmary for five days until the examining psychiatrist, Dr. Philip Springer, determined he could be released back to his wing. Id. In his notes, Dr. Springer reported that despite McKinney's "fatigued appearance," "agitated behavior," "angry mood and affect," "skewed perception," and "poor insight and judgment," he retained positive and healthy thoughts.[14] Id. Contrary to Dr. Springer's assessment, McKinney was sprayed with

---

[14] Dr. Springer erroneously noted in McKinney's record that he had been classified as an S-3 inmate for his entire period of incarceration, which is inaccurate based on the record, which indicates that at this time he had already been given a higher classification on at least one occasion, when he was designated an S-5 inmate on March 13, 2003, while at UCI. Thomas,

20

chemical agents only four hours after his release back to his wing on June 21 for kicking, banging, and yelling obscenities, sprayed again on June 22 for the same behaviors, and transferred to UCI for one week of treatment immediately thereafter due to a risk of suicide or injury to self or others. Id. Treatment notes from this period record McKinney as stating, "I feel depressed most of the time. I'm getting gassed."

Again, in the first six months of 2005, McKinney was sprayed four times with chemical agents, declared multiple psychological emergencies, admitted to suicidal ideations, set his cell on fire, and was diagnosed at least once with "acute symptoms which cannot be managed safely on an outpatient basis." On April 3, McKinney wrote to DOC Health Services requesting inpatient counseling for depression and "thoughts of hurting myself." In the letter, he noted that he had been gassed between 30 and 40 times. During this period, McKinney was transferred back and forth from FSP to UCI twice and in May consented to being prescribed psychotropic medication. Id.

Then, in May 2007, after a period of relative adjustment to life on the close-management wing, McKinney was transferred back to UCI, where he consented to being prescribed another psychotropic medication. Id. McKinney remained at UCI

2009 WL 64616, at *16 & n.35.

21

for treatment for seven weeks, and a July 2, 2007, treatment note indicates he was classified as an S-4 inmate at this time.  Id.  Four days later, McKinney returned to FSP.  Id.  On July 25, he was then sprayed twice in the same day for refusing to remove his arm from his food flap.  After both incidents, McKinney refused to leave his cell for a decontaminating shower, as he had on many past occasions.  Id. Treatment notes indicate that McKinney exhibited agitated, hostile, oppositional, and defiant behaviors at this time and was unwilling to cooperate with any of the DOC employees conducting post-use-of-force examinations.  Id. at *17.  However, treatment notes from the following day indicate that McKinney did not appear to be in crisis, exhibited no evidence of psychosis, but his use-of-force history demonstrated that he struggled to function in the FSP environment and was therefore referred to a supervisor for further assessment.  Id.

Soon thereafter, the record indicates that Dr. Hall, one of deendants' experts, reviewed McKinney's file in preparation for trial and generated an "emergency referral" to have McKinney removed to UCI.  Id.  On July 31, 2007, McKinney was transferred to UCI due to his history of use-of-force incidents (five in the last four months), refusal to participate in case management or group therapy, refusal of medication, history of self-injurious behavior, poor adjustment to incarceration, and hundreds of disciplinary reports.  Id.  The assessment further stated that

although McKinney's thought processes were clear and coherent, he nonetheless had evidence of a formal thought disorder, marked by suspicious thoughts and paranoid features. Id. Dr. Hall testified that while none of McKinney's mental health evaluations indicated any acute impairment warranting referral to an inpatient unit, his long-established pattern of repeated conflicts, disciplinary reports and refusals to participate in treatment indicated that he needed a more structured and intensive setting for his mental health needs. Id. McKinney remains incarcerated at UCI at this time.

C. Recent DOC Reforms

The district court also heard testimony at trial about recent reforms instated by the DOC in an attempt to address the general increase in the number of inmates with mental illness incarcerated nationwide and as a result of an earlier lawsuit addressing the conditions of confinement and delivery of mental health services for inmates housed on close-management wings throughout the State of Florida. Id. at *9–11. See Osterback v. McDonough, 549 F. Supp. 2d 1337 (M.D. Fla. 2008). The defendants put forth this evidence in an attempt to demonstrate that even if the district court concluded that they violated the plaintiffs' Eighth Amendment rights in the past, the DOC's policies with respect to mental health services at FSP have evolved such that the plaintiffs no longer face a real risk of being subjected to an

23

Eighth Amendment violation in the future. These reforms include "the Osterback training," which provides additional training for security staff working on close-management wings in order to teach these officers to recognize the signs and symptoms of the onset of acute mental illness. Thomas, 2009 WL 64616, at *9. There is also a new policy that now requires a post-use-of-force mental health evaluation of inmates subjected to a use of force within one day of the incident, excluding holidays and weekends. Id. An additional policy change provides new transitional housing for inmates being transferred between FSP and UCI. Id. at *10. Inmates awaiting transfer to UCI housed in the new temporary O-Dorm may not be non-spontaneously sprayed with chemical agents, and those newly transferred back to FSP from UCI now spend 90-days in a transitional N-Dorm where they may only be non-spontaneously sprayed with chemical agents if security staff trained in crisis intervention deem it appropriate. Id.

D.    Final Judgment

On this record, the district court concluded that McKinney demonstrated that the repeated chemical sprayings he received pursuant to the DOC's non-spontaneous use-of-force policy constituted cruel and unusual punishment, id. at *26–27, and that recent DOC reforms did not eliminate the risk that he would be unconstitutionally subjected to the policy in the future, id. at *28–30. To remedy

24

this Eighth Amendment violation, the district court issued a final injunction that enjoined defendants from allowing the non-spontaneous use of chemical agents on McKinney without first consulting with the DOC's trained mental health staff to determine whether he is capable of conforming his conduct to the directives given by corrections staff. Thomas v. McNeil, No. 3:04-cv-917-J-32JRK, 2009 WL 605306, at *2–3 (M.D. Fla. March 9, 2009).

## II. STANDARD OF REVIEW

The defendants raise two issues on appeal: whether McKinney established an Eighth Amendment violation and whether the district court's injunction was proper. Although we review the district court's entry of a permanent injunction for an abuse of discretion, the district court's underlying legal conclusion—that there was an Eighth Amendment violation warranting equitable relief—is reviewed de novo. Common Cause/Georgia v. Billups, 554 F.3d 1340, 1349 (11th Cir. 2009). Subsidiary issues of fact are reviewed for clear error. Id.

## III. DISCUSSION

The Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the State of Florida through the Due Process Clause of the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S. Ct. 1417 (1962), prohibits the "unnecessary and wanton infliction of pain," Hudson v. McMillian,

25

503 U.S. 1, 5, 112 S. Ct. 995, 998 (1992). In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation. Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008), overruled in part on other grounds, Randall v. Scott, No. 09-12862, 2010 WL 2595585 (11th Cir. Jun 30, 2010). The Eighth Amendment can give rise to claims challenging specific conditions of confinement, the excessive use of force, and the deliberate indifference to a prisoner's serious medical needs. Id. Each of these claims requires a two-prong showing: an objective showing of a deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities" and a subjective showing that the official had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994) (internal citations and quotations omitted).[15] Both of these inquiries are contextual. Because the Eighth Amendment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society," the objective harm inquiry is contextual in that it is responsive to

---

[15] The Prison Litigation Reform Act ("PLRA") also mandates that a plaintiff inmate exhaust administrative remedies prior to filing an Eighth Amendment suit. 42 U.S.C. § 1997e(a); Chandler v. Crosby, 379 F.3d 1278, 1286 (11th Cir. 2004). The district court concluded that the plaintiffs had adequately exhausted their administrative remedies under the PLRA, a finding the parties have not contested on appeal.

contemporary standards.  Hudson, 503 U.S. at 8, 112 S. Ct. at 1000 (internal citation and quotation omitted).  Additionally, what is necessary to show sufficient harm and what is necessary to show a sufficiently culpable state of mind varies with the type of Eighth Amendment claim at issue.  Id. at 8–9, 112 S. Ct. at 1000.

For example, to make out a claim for an unconstitutional condition of confinement, "extreme deprivations" are required, whereas in the excessive-force context, contemporary standards of decency may be violated even where no significant injury is evident.  Id. at 9–10, 112 S. Ct. at 1000.  With respect to the subjective inquiry, in both prison conditions and medical needs cases, the relevant state of mind for purposes of liability is deliberate indifference.  Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 2327 (1991).  Excessive-force claims, however, require a showing of a heightened mental state—that the defendants applied force "maliciously and sadistically for the very purpose of causing harm."  Id. at 302, 111 S. Ct. at 2326 (citing Whitley v. Albers, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 1085 (1986)).

The district court evaluated the plaintiffs' claims as a challenge to a condition of their confinement.  The defendants raise the threshold argument on appeal that in doing so the district court applied the wrong Eighth Amendment standard.  We address this argument first before turning to an analysis of the

defendants' challenges to the declaratory judgment and injunctive relief awarded to McKinney.

A.      Governing Eighth Amendment Standard

According to the defendants, because this case challenges the constitutionality of a use-of-force policy, which is employed by corrections officers to respond to a prison disturbance and for purposes of maintaining prison discipline, this case can only be properly characterized as a challenge to an excessive use of force. Because Eighth Amendment claims alleging excessive force require a showing that the defendant acted "maliciously and sadistically for the very purpose of causing harm"—a higher standard than that governing Eighth Amendment claims alleging an unconstitutional condition of confinement—the defendants argue that had the district court applied the proper standard, McKinney would never have prevailed on the merits of his claim. While the defendants expended significant efforts briefing this issue on appeal, they failed to adequately preserve these arguments before the district court.

The defendants assert that they raised the argument that an excessive-force standard should govern the plaintiffs' claims "well before final judgment" and that this was sufficient to preserve the issue for purposes of appeal. We disagree. Although the defendants technically raised this argument before final judgment,

28

they also waited until after the district court's five-day bench trial and after the district court's entry of its 75-page findings of fact and conclusions of law to challenge the application of a conditions-of-confinement standard to the plaintiffs' claims. It was not until the defendants filed a post-trial motion to amend the district court's findings under Fed. R. Civ. P. 52(b) that they first argued that an excessive-force standard should exclusively govern the plaintiffs' case. This last-ditch attempt at preservation is simply inadequate. See MCA Television Ltd. v. Feltner, 89 F.3d 766, 770–71 (11th Cir. 1996) (holding that a defendant's failure to raise a legal issue before or during his case at trial waived his right to pursue the issue on appeal); United States v. Millet, 559 F.2d 253, 257 (5th Cir. 1977) ("This Court is of the opinion that raising this issue by way of a post-trial motion was so untimely as to amount to a waiver.").[16] See also Highlands Ins. Co. v. Lewis Rail Serv. Co., 10 F.3d 1247, 1251 (7th Cir. 1993) ("Lewis waived this argument by failing to raise this argument until its motion to reconsider."); Am. Meat Inst. v. Pridgeon, 724 F.2d 45, 47 (6th Cir. 1984) (concluding that by raising their severability argument for the first time in their motion for reconsideration, the defendants effectively waived this argument and "have no basis to assign failure to

---

[16] The Eleventh Circuit, in an en banc decision, Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

29

sever as an error on this appeal"). Accordingly, we decline to consider the

defendants' belated arguments now.

The defendants' delay in raising this argument is particularly inexcusable in

light of the ample notice the plaintiffs and the district court gave the defendants as

to their intent to treat this case as a conditions-of-confinement challenge, not an

excessive-force case.[17] Despite this notice, the defendants repeatedly endorsed the

use of a deliberate-indifference standard to analyze the plaintiffs' equitable claims

in their summary judgment submissions, pre-trial brief, and post-trial proposed

---

[17] For example, in the plaintiffs' pre-trial brief, they candidly highlighted the issue of which Eighth Amendment standard should apply, admitting that their case did not "fit neatly into either category" of Eighth Amendment claims. The plaintiffs then made the argument, which the district court ultimately adopted, that the deliberate-indifference standard was more appropriate for this case because the plaintiffs challenge a broad "eight-year policy of an entire department" not deserving of the deference given to a single guard's decision to use force in an individual incident of alleged excessive force. At trial, the plaintiffs again emphasized that although this case implicates the "use of force," it is about "existing conditions." The district court also plainly indicated at trial that it understood this case "not to be about . . . policies . . . incorrectly applied to specific persons, such as would be in an excessive force case . . . ," but whether a policy that is being correctly applied is unconstitutional.

Furthermore, when asked to submit proposed findings of fact and conclusions of law, the plaintiffs did not hesitate to clearly reiterate their consistent position that the DOC's wantonness should be considered under the deliberate indifference standard. The plaintiffs argued that "[i]n prison cases—such as the instant case—where 'officials formulate a policy in circumstances where there are no particular constraints on the officials' decisionmaking process . . . and the implementation of the policy will inflict pain upon the inmates on a routine basis, [courts] need not look for a showing of action taken "maliciously and sadistically" before Eighth Amendment protections are implicated.'" See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc).

findings of fact.[18]  In light of the defendants' failure to assert the contrary, it is unsurprising that the district court concluded not only that the deliberate-indifference standard was the proper standard for analyzing the plaintiffs' claims but also that the defendants effectively acquiesced in this conclusion.  Thomas, 2009 WL 64616, at *21 n.42 (reasoning that where the challenge is against top DOC officials and challenges a prison's "considered policy" regarding the use of non-spontaneous force on fully secured inmates with mental illness the heightened standard applicable to decisions made "in haste, under pressure, and frequently without the luxury of a second chance" was not appropriate (citing Whitley, 475 U.S. at 320, 106 S. Ct. at 1084) and noting that "Defendants have not suggested" otherwise).

---

[18]    Beginning with the defendants' summary judgment motion, they acknowledged that the plaintiffs' injunctive claims were claims "related to the conditions of their confinement." In their motion for reconsideration of their summary judgment motion—filed one month before trial—they unequivocally stated that "Plaintiffs' claims as plead are expressly limited to conditions of confinement at FSP (i.e., the non-spontaneous use of chemical agents)."  In their pre-trial brief, the defendants recite both the "deliberate indifference" and "malicious and sadistic" standards governing various Eighth Amendment claims but then make no attempt to specify which standard should govern the claims at issue in the upcoming bench trial.  And yet after trial, in their proposed findings of fact and conclusions of law, the defendants suggested that the deliberate indifference standard applies.  Under the heading, "The Department's policy does not violate the Eighth Amendment," the defendants described the standard that "Plaintiffs must meet" as being "proof that the correctional officer in question was deliberately indifferent to the harm or risk of harm."  Although the defendants did later in this same brief cite language from Whitley under a separate heading entitled "Chemical Agents," there was no clear assertion that the Whitley's excessive-force standard should apply to this case.  Significantly, nowhere in their proposed conclusions do the defendants argue that the excessive-force standard should be used exclusively.  And nowhere do the defendants respond to the plaintiffs' and the district court's assertions that this case challenges a condition of confinement.

In sum, the defendants' attempt to raise this issue in a post-trial motion, regardless of whether that motion was submitted technically before final judgment, was insufficient to preserve it for appeal. It would subvert the orderly judicial process to permit the defendants to wait until after the presentation of the evidence, after the pre-trial and post-trial briefing, and after the district court had painstakingly concluded that the use of chemical agents on McKinney amounted to an unconstitutional condition of his confinement to request an entirely new lens through which to evaluate his claims. Thus, we hold that the defendants waived any challenge to the district court's use of the deliberate-indifference standard. We assume without deciding that the district court was correct in treating the plaintiffs' claims as a challenge to a condition of their confinement and evaluate McKinney's claim under this standard.

B.    McKinney's Subjection to Chemical Agents as an Unconstitutional Condition of Confinement

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." Farmer, 511 U.S. at 832, 114 S. Ct. at 1976 (internal quotation and citation omitted). Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. Id. However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary

32

standards of decency are subject to Eighth Amendment scrutiny. Hudson, 503 U.S. at 8–9, 112 S. Ct. at 1000. Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. Farmer, 511 U.S. at 828, 114 S. Ct. at 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303, 111 S. Ct. at 2327.

The defendants assert on appeal that McKinney failed to satisfy both the objective and subjective components of his conditions-of-confinement claim. We begin with an analysis of the objective inquiry. In doing so, we are mindful that we must refrain from imposing our own theories of penology on the nation's prisons and strive to inform our analysis with objective factors to the maximum extent possible. See Rhodes v. Chapman, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399 (1981) ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges.") (internal quotation and citation omitted); Chandler v. Crosby, 379 F.3d 1278, 1290 (11th Cir. 2004) ("As judges, we lack carte blanche to impose our own theories of penology on the nation's prisons.") (internal quotation and citation omitted).

i.    Extreme Deprivation

The district court concluded that McKinney's subjection to the DOC's non-

spontaneous use-of-force policy amounted to an extreme deprivation satisfying the Eighth Amendment's objective injury requirement. Thomas, 2009 WL 64616, at *24, *27. More specifically, the court concluded that it was an extreme deprivation of McKinney's constitutional right to humane prison conditions for FSP officers to repeatedly spray him with chemical agents in order to enforce prison regulations with which McKinney had no capacity to comply due to his mental illness with the result that these sprayings caused him "lasting psychological injuries." Id. at *22–24, *27.

We review the district court's factual findings for clear error and its legal conclusions de novo. Common Cause/Georgia, 554 F.3d at 1349. "Clear error is a highly deferential standard of review." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1350 (11th Cir. 2005). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (internal quotation and citation omitted). Whether the record demonstrates that McKinney was sprayed with chemical agents at times in which he had decompensated (i.e., at times when he was unable to understand and comply with officers' orders because of his mental illness) and that he suffered psychological

34

injuries from such sprayings are questions of fact. Whether these deprivations are objectively "sufficiently serious" to satisfy the objective prong, Farmer, 511 U.S. at 834, 114 S. Ct. at 1977, is a question of law we evaluate based on "evolving standards of decency," Rhodes, 452 U.S. at 346, 101 S. Ct. at 2399. We balance these standards of decency against prison officials' need to keep the prison safe. Hope v. Pelzer, 240 F.3d 975, 979 (11th Cir. 2001), overruled in part on other grounds, 536 U.S. 730, 122 S. Ct. 2508 (2002). "However, an infliction of pain 'without penological justification' is considered to be 'unnecessary and wanton.'" Id. We agree with the district court that McKinney has satisfied this objective standard.

The defendants challenge both the district court's factual findings with respect to McKinney and its legal conclusion that the use of chemical agents in McKinney's case satisfied the Eighth Amendment's objective injury requirement. With respect to the court's factual findings, the defendants argue that "there is no evidence that [McKinney] was ever acutely mentally ill when sprayed" or that he "could not understand officers' commands or control his actions each time he was sprayed with chemical agents." With respect to the district court's legal conclusion, the defendants argue that because chemical agents have been deemed the least harmful alternative among the options available to prison officials to

respond to a prison disturbance their use can never constitute "unnecessary or brutal treatment in violation of the Eighth Amendment." The defendants even go so far as to argue that the use of chemical agents, where administered properly, even when administered against a decompensated inmate, "do not exceed the normal discomfort of the prison environment." We reject both of these arguments in turn.

First, with respect to the court's factual findings, our independent review of McKinney's record demonstrates that the court did not clearly err in finding that McKinney had decompensated[19] at times that he was sprayed with chemical agents and that he suffered psychological injury from these sprayings. McKinney's record demonstrates that he was sprayed with chemical agents pursuant to the DOC's non-spontaneous use-of-force policy on 36 separate occasions between 2001 and 2007, when he was last transferred to UCI for inpatient treatment. On all but two of these occasions, he was sprayed for causing a disturbance on his wing by yelling and/or kicking and beating his cell door or steel bed, behaviors which were identified at trial as consistent with and indicative of "an exacerbation of the mental illnesses

---

[19]     The district court used the phrases "sprayed at time he had decompensated" and "spraying him with chemical agents . . . for behaviors caused by his mental illness" as having the same meaning as the defendants' having sprayed McKinney at times when he was unable to understand or comply with the orders of DOC officials.

36

from which S-3 and S-4 inmates suffer."[20] Thomas, 2009 WL 64616, at *5. On many occasions, McKinney exhibited unambiguous symptoms of decompensation immediately prior to these chemical sprayings. McKinney's record also demonstrates that he frequently displayed acute symptoms of his mental illness following chemical sprayings, which often led to his transfer to UCI or the FSP infirmary for treatment.

For example, on March 5, 2003, he was sprayed with chemical agents, only to be found the following day engaged in the bizarre behavior of jumping off his cell sink, which led to his immediate transfer to UCI where he was reclassified as an S-5 inmate. Id. at *15. On July 15, 2003, he was sprayed with chemical agents and transferred the next day to the FSP infirmary and then to UCI for weeks of psychiatric observation and treatment. Id. On October 6, 2003, McKinney warned a psychological specialist he was going to hurt himself, and yet officers sprayed him with chemical agents the following day on two separate occasions, once for throwing his feces and once for yelling and kicking in his cell. That same day, officers also performed a cell extraction to search his cell. Id. Four days later, officers again sprayed McKinney with chemical agents, and two days later he

---

[20] The two exceptions involved an incident in which McKinney threw feces at a staff member on October 7, 2003, and an incident in which McKinney refused to remove his arm from the food-flap opening in his cell on July 25, 2007. Thomas, 2009 WL 64616, at *15, *16.

exhibited extreme psychological distress, banging his head on his steel bunk and cell door, which resulted in his transfer to the emergency room and then to UCI for two weeks of treatment.  Id.  Although McKinney was theoretically stabilized at UCI during this treatment and deemed capable of returning to his FSP wing, he jumped down a flight of stairs two days after his return, resulting in a laceration requiring seven stitches.  After this incident, McKinney expressed ongoing suicidal ideations.  Id.  Similarly, in June 2004, McKinney was sprayed with chemical agents and then sent to the FSP infirmary the following day for a psychological assessment.  Id. at *16.  Four hours after his release to his FSP wing, McKinney was again sprayed with chemical agents, and the same behavior subjected him to a second spraying the next day.  Id.  Immediately following this spraying, he was transferred to UCI as a suicide or self-injury risk.  Id.

Moreover, viewing McKinney's record as a whole it is apparent that during the periods in which he was repeatedly sprayed with chemical agents he experienced frequent psychological emergencies, which included suicide attempts (by hanging on August 21, 2002), suicidal threats and ideations (May 29, 2003, September 6, 2003, February 2004, and June 2004), self-injurious behavior (jumping off his cell sink on March 6, 2003, setting fire to his cell on May 25, 2003 and May 16, 2005, head banging on October 13, 2003, and diving off a flight of

38

stairs on October 29, 2003), and psychotic episodes (bouts at the FSP infirmary with diagnoses of being "suicidal, homicidal, bipolar, and psychotic" in December 2002 and receiving a mental health emergency diagnosis on May 16, 2005 that he was experiencing "acute symptoms which cannot be managed safely on an outpatient basis"). McKinney's record also provides repeated documentation of his fear of chemical sprayings, which impacted his ability to cope on the close-management wing and was his stated reason for refusing to accept psychotropic medication that could have helped stabilize his mental illness. See id. at *15–16 (UCI treatment notes from July 2003 indicate that McKinney was "doing well coping while [at UCI] but does not know how he will cope at FSP because he believes he has to be on guard against unwarranted gassings"; UCI treatment notes from October 2003 indicate that McKinney believed he was "having problems with staff . . . gassing him . . . even if he does nothing"; March 2004 treatment notes indicate that McKinney refused to take medication because he needed to be alert because "they gas [him] so often"; UCI treatment notes from June 2004 indicate that McKinney felt "depressed most of the time" in part due to frequent gassings; April 3, 2005 letter from McKinney to DOC Health Services complained of frequent sprayings). Additionally, McKinney's record demonstrates that he was reclassified from S-3 status on at least two occasions during his treatment at UCI,

39

once as an S-5 inmate in March 2003 and once as an S-4 inmate in July 2007. He was also transferred between FSP, the FSP infirmary, and UCI seventeen times during the five-year period between 2002 and 2007.

Dr. Burns, the plaintiffs' Correctional and Mental Health Expert and former Chief Psychiatrist for the Ohio Department of Corrections, also interviewed McKinney and reviewed his file in 2006. Id. at *18. She testified that, based on his record, he was "likely symptomatic" on occasions when he was sprayed with chemical agents but that DOC staff was unable to recognize his symptoms because of their similarity with typical disruptions on the prison wing, resulting in his assessment as having poor adjustment to the wing as opposed to suffering from any acute impairment. Id. Although the record testimony with respect to McKinney does not contain any unambiguous express assertion that he had decompensated at the time of any of these sprayings—such as the incompetency findings for purposes of disciplinary proceedings related to various use-of-force incidents contained in Thomas's record, see id. at *12[21]—his record as a whole supports the district

---

[21]    The fact that Thomas was found not mentally competent at the time of at least two chemical sprayings in 2000, as well as the fact that he was sprayed four days in a row despite medical staff's notation that he "could be decompensating," see Thomas, 2009 WL 64616, at *12–13, further bolster the district court's finding with respect to McKinney. Thomas's record demonstrates that the non-spontaneous use-of-force policy was regularly applied notwithstanding obvious indications that inmates were experiencing an exacerbation of their mental illnesses and, as a result, could not understand or comply with officers' orders, making it more likely that the policy was similarly applied to McKinney.

court's factual findings. In sum, we conclude that the district court did not clearly err in finding that McKinney was sprayed with chemical agents at times when he had no capacity to comply with officers' orders because of his mental illness. See id. at *27. Nor did the district court clearly err in finding that these sprayings caused him "lasting psychological injuries."[22] Id.

In light of these factual findings, we also readily conclude that the DOC's repeated non-spontaneous use of chemical agents on McKinney constituted an extreme deprivation sufficient to satisfy the objective prong. Although it is well-established that the use of chemical agents on recalcitrant prisoners is not per se unconstitutional, Danley, 540 F.3d at 1307 ("Pepper spray is an accepted non-lethal means of controlling unruly inmates[,] . . . [and a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's

---

[22]    The district court's finding that the sprayings caused McKinney lasting psychological injuries is supported not only by the numerous times noted above that McKinney was reclassified above S-3 status and/or transferred to UCI immediately after one or more sprayings, but it is also supported by the general record evidence addressing the potential for chemical agents to cause psychological injury. See Thomas, 2009 WL 64616, at *4 (crediting Dr. Burns' testimony that the exposure to chemical agents may cause "feelings of intense helplessness, fear of dying, attempts at suicide and exacerbation of other symptoms of mental illness); at *8 (summarizing the CMA's 2003-2004 report stating that the inappropriate use of chemical agents on inmates in close management wings had resulted in the exacerbation of mental health symptoms, which in one instance led to an inmate's suicide). See also Danley, 540 F.3d at 1309 (internal quotations and citations omitted) (noting that in addition to the intense physical pain intended by its use, pepper spray (the most commonly used chemical agent by the DOC),"sometimes also causes disorientation, anxiety, and panic in the person sprayed") (internal citation and quotation omitted). See also supra n.8 and accompanying text.

41

orders."); <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment . . . ."); <u>Spain v. Procunier</u>, 600 F.2d 189, 196 (9th Cir. 1979) ("use of nondangerous quantities of [tear gas] in order to prevent a perceived future danger does not violate 'evolving standards of decency' or constitute an 'unnecessary and wanton infliction of pain'"), there are constitutional boundaries to its use. <u>See</u> <u>Gates v. Collier</u>, 501 F.2d 1291, 1304 (5th Cir. 1974) ("[T]here is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment."). The district court did not categorically condemn the DOC's non-spontaneous use-of-force policy. Rather, the court found that McKinney's well-documented history of mental illness and psychotic episodes rendered him unable to comply at the times he was sprayed such that the policy was "unnecessary" and "without penological justification" in his specific case. This conclusion is in keeping with prior decisions of this court and other circuit courts of appeals, which have concluded that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement. <u>See</u> <u>Danley</u>, 540

F.3d at 1311 (holding that prolonged exposure to pepper spray due to a failure to properly decontaminate an inmate may form the basis of an Eighth Amendment claim); Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008) (use of additional bursts of pepper spray after inmate attempted to comply with officer's orders and which possibly contributed to inmate's asphyxiation and death sufficiently alleged objective component of excessive force claim); Soto, 744 F.2d at 1270 ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain.").

McKinney was subjected to chemical sprayings pursuant to a DOC policy that does not require a corrections officer or his superiors to review an inmate's mental health records prior to authorizing the decision to use chemical agents on an inmate causing a disturbance in his cell.  Thus, it is DOC policy that if an inmate has been classified as an S-3 inmate and lives in an FSP close-management wing, regardless of his mental health history, chemical agents are available for non-emergency use.  However, at the same time the record establishes that mental illness is fluid and that an inmate's mental health status may deteriorate at any time, gradually or suddenly, causing him to "become confused, disorganized and disoriented" and "incapable of understanding or conforming to demands."

43

Thomas, 2009 WL 64616, at *6. Furthermore, the record establishes that security staff struggle to differentiate between an inmate's willful noncompliance with prison rules and behavior that is a sign of acute impairment for which the person cannot be held entirely accountable. Id. at *9. In light of these realities, as well as the impossibility of constantly monitoring an inmate for the possible need to reclassify his mental status, relying solely on an inmate's S-3 status to determine whether the use of chemical agents is appropriate fails to take into consideration the fact that McKinney was no longer capable of conforming his conduct to prison regulations. "[I]f the inmate cannot understand the command and cannot comply with it, the force simply produces pain . . . ." Id. at *23. We agree with the district court that "if the DOC fails to account for an inmate's decompensation, with the result that he is gassed when he cannot control his actions due to his mental illness, then the force no longer has a necessary penological purpose and becomes brutality." Id. The DOC itself recognizes that the indiscriminate non-spontaneous use of chemical agents on decompensated inmates fails to advance its penological goals. Aside from emergency situations in which there is a threat of immediate harm to an inmate or others, the DOC does not permit the use of chemical agents on inmates with S-4, S-5, or S-6 status or those receiving treatment in inpatient settings like UCI (which houses some S-3 inmates).

44

Additionally, we agree with the district court that the "lasting psychological injuries" suffered by McKinney as a result of his subjection to repeated chemical sprayings at FSP are sufficiently serious injuries to satisfy the objective harm requirement. McKinney need not have suffered lasting physical injury from the sprayings to subject DOC conditions to Eighth Amendment scrutiny. The case law establishes that "mental health needs are no less serious than physical needs" for purposes of the Eighth Amendment. Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004). See Hope v. Pelzer, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514–15 (2002) (highlighting "taunting" and "humiliation" as circumstances which contributed to finding that handcuffing petitioner to a hitching post after "[a]ny safety concerns had long since abated . . . violated the basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man") (internal quotation and citation omitted); Smith v. Aldingers, 999 F.2d 109, 109 (5th Cir. 1993) (reversing dismissal of Eighth Amendment claim because district court failed to consider whether purely psychological injury could constitute an Eighth Amendment injury); LaMarca v. Turner, 995 F.2d 1526, 1544 (11th Cir. 1993) (affirming injunction ordering psychological counseling of rape victims to address unnecessary and wanton infliction of pain of failing to provide prisoners with post-rape psychological counseling); Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir.

45

1993) (explaining that serious physical or emotional injury may give rise to an Eighth Amendment violation); Northington v. Jackson, 973 F.2d 1518, 1524 (10th Cir. 1992) (holding that psychological injury may constitute pain under the Eighth Amendment excessive force standard).

Accordingly, we hold that the policy and practice of spraying inmates with chemical agents, as applied to McKinney under the circumstances found here—i.e., when he was fully secured in his seven-by-nine-foot steel cell, when he was not presenting a threat of immediate harm to himself or others, and when he was unable to understand and comply with officers' orders due to his mental illness—are extreme deprivations violating the "broad and idealistic concepts of dignity, civilized standards, humanity and decency" embodied in the Eighth Amendment. Hope, 240 F.3d at 979 (citing Estelle v. Gamble, 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976)). McKinney has demonstrated that he is one such inmate and thus has satisfied the Eighth Amendment's objective harm requirement. We now turn to the question of whether McKinney also satisfied the Eighth Amendment's subjective wantonness requirement.

ii.   Deliberate Indifference

In conditions-of-confinement cases, wantonness is established by proving that a defendant prison official was deliberately indifferent to a risk of serious harm

to the plaintiff inmate.  Farmer, 511 U.S. at 828, 114 S. Ct. at 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303, 111 S. Ct. at 2327; LaMarca, 995 F.2d at 1535.  In our circuit, to find deliberate indifference on the part of a prison official, a plaintiff inmate must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.  Townsend v. Jefferson County, 601 F.3d 1152, 1158 (11th Cir. 2010); see also Chandler, 379 F.3d at 1290, n.21.  That is, the evidence must demonstrate that "with knowledge of the infirm conditions, [the official] knowingly or recklessly declined to take actions that would have improved the conditions."  LaMarca, 995 F.2d at 1537.  A prison official's deliberate indifference is a question of fact which we review for clear error.  See Farmer, 511 U.S. at 842, 114 S. Ct. at 1981; Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007); Fed. R. Civ. P. 52(a).  "Whether a prison official had the requisite knowledge of a substantial risk is . . . subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842, 114 S. Ct. at 1981 (internal citations omitted).

The district court found that the record demonstrated that "DOC officials acted with deliberate indifference to the severe risk of harm Michael McKinney

47

faced when officers repeatedly sprayed him with chemical agents at FSP for behaviors caused by his mental illness." Thomas, 2009 WL 64616, at *27. We have already established for purposes of the Eighth Amendment's objective injury requirement that McKinney's individual record contains ample evidence to support the district court's finding that because of his mental illness McKinney was unable to understand and comply with officers' orders during some of the periods in which he was sprayed with chemical agents. Furthermore, our review of the district court's voluminous uncontested factual findings as they relate to the defendants' deliberate indifference does not leave us "with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573, 105 S. Ct. at 1511 (internal quotation and citation omitted). Accordingly, the defendants have failed to satisfy their burden of demonstrating the district court's clear error.

As to the defendants' subjective knowledge of a risk of harm to McKinney, the record establishes both that the "frequent-flier" syndrome was well-recognized by DOC officials and staff and that it would have been obvious to DOC officials that McKinney was one such frequent-flier. See Thomas, 2009 WL 64616, at *6 ("The security and mental health staff who testified or gave statements were

48

generally all familiar with this phenomena . . . .").[23]  McKinney's individual inmate record demonstrates that between 2001 and 2007, he was transferred to UCI ten times for ongoing treatment and to the FSP infirmary seven times for various psychological emergencies.  Id. at *15–17.  On at least two such occasions he was reclassified as an S-5 or S-4 inmate.  McKinney's record also demonstrates that after stabilizing treatment at UCI, he struggled to readjust to life on his FSP wing, and often returned to UCI or the infirmary for further treatment soon thereafter.

The record also demonstrates that DOC officials had subjective knowledge that the use of chemical agents may cause psychological harm to inmates with mental illness, especially frequent-fliers like McKinney.  Nurse Battles testified that for a period of time, the DOC generated a list of inmates awaiting transfer to UCI for whom the use of chemical agents was contraindicated, but due to a change of warden the policy was discontinued.  Id. at *6.  Dr. Nguyen testified that during her tenure she had instructed DOC medical staff to review the charts of S-3 inmates to determine whether there were any mental health contraindications against the

---

[23]  Former FSP and UCI psychiatrist Dr. Infante, former Warden James Crosby, former FSP and UCI medical director Tuong Nguyen, and former FSP Senior Nursing Supervisor Tina Battles all testified to their knowledge of the issue of frequent-fliers at FSP.  Thomas, 2009 WL 64616, at *6.  FSP's current lead senior psychologist Peggy Watkins-Ferrell, also testified that "on any given working day" one or two inmates are referred out of FSP for inpatient treatment.  Id. at *8.  Richard Stalder, the defendants' correctional expert, "was also of the opinion that the 'frequent flier' syndrome represented a possible breakdown in care that should be addressed at higher levels."  Id. at *7.

use of chemical agents.  Id. at *7.  Former FSP psychiatrist Donald Gibbs testified that based on his experience of treating inmates at FSP in 2003 and 2004, the use of chemical agents on mentally ill inmates exacerbated their symptoms.  Id. at *4.  Additionally, as discussed above, DOC policy provides that the first response to disturbances such as banging and yelling at UCI is mental health intervention; the use of chemical agents to quell a non-emergency disturbance at UCI is not permitted because of these inmates' psychological vulnerabilities.  Id. at *5.

DOC recent policy reforms further demonstrate the DOC's subjective knowledge of the psychological harm chemical agents can cause frequent-fliers.  UCI's new O-Dorm houses 114 S-3 inmates (approximately 15% of FSP's S-3 population) awaiting transfer from FSP to an inpatient facility and the new N-Dorm provides transitional housing for recently stabilized inmates returning from UCI to FSP.  Id. at *10.  Chemical agents are not permitted as a response to non-emergency disturbances at O-Dorm and may only be used at N-Dorm if a specially-trained crisis-intervention team deems it appropriate.  Id.

McKinney's record, which demonstrated his frequent need for inpatient treatment and psychological screening due to a pattern of self-injurious behavior and suicidal ideations, put the DOC on notice that he was in a category of inmates whose mental health was "particularly fragile" and that "notwithstanding his S-3

designation, he was especially susceptible to decompensating." Id. at *26.

Moreover, the record establishes that the named defendants also had subjective

knowledge of a risk of harm specific to McKinney.[24] FSP's former duty warden,

George Sapp, testified that FSP officials meet daily to review the previous day's

use-of-force logs in order to know "what was transpiring on the wings at all time

and that force was being used appropriately." Additionally, the DOC's non-

spontaneous use-of-force policy mandates that FSP's warden or, in his absence,

duty warden authorize every non-spontaneous use of chemical agents. See Fla.

Admin. Code r. 33-602.210(17)(n)(2)(b) ("[T]he shift supervisor shall . . . [c]ontact

the warden or, in his or her absence, the duty warden and request authorization to

utilize chemical agents."). Therefore, the named defendant, the Warden of FSP,

would have subjective knowledge of the inmates on which chemical agents are

being used. Given the frequency with which McKinney was sprayed with chemical

---

[24] The district court did not specifically link its deliberate indifference finding to the named defendants, the Warden of FSP or the Secretary of the DOC. Our case law requires that plaintiff inmates prove the subjective deliberate indifference of the named defendants to prevail in their § 1983 lawsuits. Cook ex. rel. Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115–16 (11th Cir. 2005) ("Thus, to succeed on her § 1983 claim, Cook must establish that the Sheriff himself, as representative of Monroe County, was deliberately indifferent to the possibility of Tessier's suicide, since neither respondeat superior nor vicarious liability exists under § 1983."). However, the defendants have not challenged, either in the district court or on appeal, the deliberate indifference finding on this ground. Therefore, any such objection is deemed waived. United States v. Curtis, 380 F.3d 1308, 1310 (11th Cir. 2004) (citing the "long-standing rule in this circuit, as well as in the federal rules themselves, that issues not raised by a defendant in his initial brief on appeal are deemed waived").

51

agents, his incredible disciplinary history (which included 320 disciplinary infractions by the time of trial), his regular transfers between UCI and FSP, and his repeated episodes of self-injurious behavior, his name would certainly have stood out to the warden.[25]  See Thomas, 2009 WL 64616, at *26 (concluding the same as to plaintiff Thomas).

Additionally, as discussed above, the record also contains evidence that the Florida Correctional Medical Authority ("CMA") issued 2003-2004 and 2005-2006 Annual Reports expressing significant concern that chemical agents were being inappropriately used on inmates in close management settings resulting in chemical burns and the exacerbation of mental health symptoms.  The 2003-2004 Annual Report made the specific recommendation to the DOC that it adopt the confrontation avoidance techniques used by the Federal Bureau of Prisons, which include an evaluation by a "designated mental health professional" prior to the use of chemical agents.  The CMA's 2003-2004 Report on the Health Care Delivery of DOC reiterated this recommendation.  This evidence supports the inference that DOC top officials and policymakers, which would include the Secretary of the

---

[25]     Although the defendants have waived any challenge to the district court's failure to find the named defendants' subjective knowledge of a serious risk of harm to McKinney, the FSP warden's direct authorization of all non-spontaneous uses of chemical agents on McKinney probably would be sufficient to demonstrate his subjective knowledge, and certainly would be sufficient to withstand any argument that the district court's finding was clearly erroneous.

52

DOC (the DOC's highest official), had subjective knowledge of the risks associated with using chemical agents on S-3 inmates without regard to their mental health histories as well as a possible means of addressing such risks.[26]

The record also supports the district court's finding that the Secretary of the DOC and the Warden of FSP recklessly disregarded the risk of psychological harm to inmates like McKinney. Despite repeated notice from the CMA Reports of a risk of harm to inmates with mental illness, the DOC chose not to adopt their recommendation to take into consideration an inmate's mental health history, through a pre-use-of-force mental health consultation or some other means, prior to administering chemical agents. See Hope, 240 F.3d at 978–79 (relying on evidence that the Alabama DOC ignored a Department of Justice report on the constitutional infirmity of the use of the hitching post as a means of inmate discipline to support an inference that the DOC was aware of a substantial risk of harm and disregarded such risk). In light of the apparent feasibility of adopting some type of pre-force mental health consultation, as evidenced by the Federal Bureau of Prisons' use of

---

[26] Although the defendants have also waived any challenge to the district court's failure to link its deliberate indifference finding to the Secretary of the DOC, this evidence would have been strong evidence to demonstrate his subjective knowledge of a serious risk of psychological harm to inmates like Michael McKinney. Although many of the use-of-force incidents in McKinney's records predated the CMA's reports and recommendations, there were ten non-spontaneous use-of-force incidents between the years 2005 and 2007 occurring after the 2003-2004 annual reports were released.

such a procedure, and the CMA's efforts to highlight the seriousness of the problem of the improper use of chemical agents on mentally ill inmates, the DOC's refusal to modify its non-spontaneous use-of-force policy provides support for the district court's finding of more than mere or even gross negligence on the part of the DOC. See LaMarca, 995 F.2d at 1537 ("Mere knowledge of the infirm conditions persisting at [a prison] does not establish deliberate indifference. The plaintiffs must also demonstrate that, with knowledge of the infirm conditions, [the prison's superintendent] knowingly or recklessly declined to take actions that would have improved the conditions.").

The FSP Warden's reckless disregard of these same risks is also apparent in his continued authorization of the use of chemical agents in periods in which McKinney was sprayed repeatedly in short periods of time when his mental illness was most active.[27] For example, chemical agents were authorized twice on a day in October 2003, only one day after McKinney had declared that he intended to hurt himself, and on the same day in which officers performed a cell extraction to search his cell. Thomas, 2009 WL 64616, at *15. Despite the authorization of three uses of force in the same day, one of which aimed at stopping McKinney from throwing

---

[27] We note that "[t]hat the individuals now holding those offices may not be the same as those in office when this suit was commenced is immaterial for purposes of this appeal since the defendants were sued in their official, not their individual capacities, and it is only in their official capacities that they are constrained by the district court[.]" Gates, 501 F.2d at 1321.

his own feces, the use of chemical agents were again authorized four days later.  Id.

This incident of force immediately preceded McKinney's two most harmful

incidents of self-injurious behavior, head banging and diving head-first off a flight

of stairs, both of which resulted in serious head injuries.  Id.

Jeremiah Thomas's inmate record provides additional circumstantial

evidence of the FSP Warden's deliberate indifference to a serious risk of

psychological harm to frequent-fliers like McKinney.  The record demonstrates that

the authorization of the use of chemical agents without any regard for their prior

use or their potential to cause serious harm to an inmate's mental health status was

likely commonplace at FSP during the period of time in which McKinney was

subjected to repeated uses of force.  Like McKinney, Thomas attempted suicide

and declared a psychological emergency immediately prior to the authorization of

repeated uses of chemical agents in a short period of time.  Id. at *13.  Thomas was

subjected to chemical agents on six of seven days in one week despite mental

health and medical staff notes that he had not taken his medication and may be

decompensating.[28]  Id.  It took UCI psychologists six months to stabilize him

_____

[28]    Although McKinney only suffered serious psychological injury from the use of
chemical agents, Thomas's record also demonstrates that DOC officials were aware that the
repeated use of chemical agents on inmates with mental illness risked serious physical injury as
well.  During the week in which Thomas was subjected to six chemical sprayings, he consistently
refused to take a decontaminating shower after each spraying.  When he was evaluated by a nurse
after two consecutive days of sprayings, she "found his skin was blistering and broken from

following this week of repeated use-of-force incidents. Id.

In sum, we cannot conclude that the district court was clearly erroneous in finding that the record demonstrates that "DOC officials turned a blind eye" to McKinney's mental health needs and the obvious danger that the use of chemical agents presented to his psychological well-being. Id. at *27. Turning a blind eye to such obvious danger provides ample support for the finding of the requisite recklessness. Even though there are ambiguities present in McKinney's record—his mental illness was often characterized by anger, maladjustment, and violence as opposed to psychosis, and many treating professionals found that McKinney suffered no acute impairment—an examination of his entire record demonstrates that the district court did not commit clear error in finding the defendants' deliberate indifference. Concluding that McKinney satisfied both the objective and subjective prongs of his Eighth Amendment conditions-of-confinement claim at trial,[29] we affirm the district court's declaratory judgment in

chemical burns, he smelled of urine and was acting delusional." Thomas, 2009 WL 64616, at *25. Despite her observations, Thomas was subjected to chemical agents the following two days and suffered first to third degree burns on his back, abdomen, arms, and buttocks. Id. His burn injuries were so severe that DOC staff considered sending him to a special burn treatment facility. Id. The record demonstrates that McKinney also frequently refused decontaminating showers, and therefore was at risk for serious physical injury as well.

[29]    Additionally, to prevail on an Eighth Amendment claim brought pursuant to § 1983, a plaintiff inmate must also show a causal connection between the constitutional violation and his injuries. Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc). As to plaintiff McKinney, the defendants raise no challenge with respect to the requirement that

his favor and turn to the defendants' challenges to the district court's permanent injunction.

### C. Injunctive Relief

After finding that the repeated use of chemical agents on Thomas and McKinney violated the Eighth Amendment, the district court concluded that they were entitled to injunctive relief. Thomas, 2009 WL 64616, at *28–30. Thereafter, the district court invited the defendants to confer with the plaintiffs to reach an agreement on the injunction's proposed terms and/or to submit their own proposal for an injunction. The defendants refused to do so, and the district court was forced to enter its final permanent injunction against the defendants without their input as to what would constitute the most narrowly drawn relief remedying the

---

§ 1983 plaintiffs demonstrate a causal connection between the alleged constitutional violation and their injury. Their only causation argument raised on appeal is that Thomas's burns were not caused by the DOC but instead by his refusal to agree to a decontaminating shower. Thus, the defendants have waived any such challenge, and we need not address the probability that the district court did make either express or implied findings of causation.

In any event, McKinney has satisfied his burden as to causation. A §1983 plaintiff may demonstrate causation either by establishing that the named defendant was "personally involved in the acts that resulted in the constitutional deprivation," LaMarca, 995 F.2d at 1538 (internal quotation and citation omitted), or by showing that the defendant instituted a "custom or policy that result[ed] in deliberate indifference to constitutional rights," Goebert, 510 F.3d at 1331 (internal quotation and citation omitted). "[S]upervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." Id. at 1332. Both the FSP Warden's direct authorization of all uses of force and the routine application of the DOC's non-spontaneous use-of-force policy without regard to an inmate's mental health status satisfy § 1983's causation requirement.

57

identified harm.   The defendants now challenge the district court's injunction.

To obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest.  KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006); Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005).  In addition to ensuring that injunctive relief was necessary under this standard, we must also ensure that the scope of the awarded relief does not exceed the identified harm.  Califano v. Yamasaki, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . .");  LaMarca, 995 F.2d at 1543 ("While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong.").  In the context of prison litigation, we must also consider the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA"), which "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions," Miller v. French, 530 U.S. 329, 331, 120 S. Ct. 2246, 2250 (2000).  The PLRA mandates that injunctive relief is only appropriate where it is "narrowly

drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).

The defendants make several arguments on appeal to the effect that an injunction is not necessary. In addition, the defendants make two arguments that the injunction is unworkable, a conclusory argument that the injunction goes beyond the identified violation, and a conclusory argument that the injunction is overly intrusive.

i. Necessity of Injunctive Relief

We first address the defendants' arguments challenging the district court's conclusion that injunctive relief was necessary to remedy the identified constitutional harm. Four challenges to the necessity of injunctive relief merit our discussion. The defendants argue that: (1) McKinney is currently incarcerated at UCI, where he is not subject to the DOC's non-spontaneous use-of-force policy, and, therefore, the injunction targets speculative as opposed to imminent irreparable injury; (2) McKinney is unable to establish a "current and ongoing" violation of his constitutional rights under the PLRA; (3) recent reforms have obviated any risk of future injury; and (4) McKinney has an adequate remedy at law to remedy any further constitutional violation.

59

First, the defendants argue that because McKinney has been incarcerated at UCI since 2007, the injunction only regulates his future exposure to chemical agents in the event he is returned to FSP, the likelihood of which is far too speculative and remote to constitute a serious risk of continuing irreparable injury. Although the irreparable-injury requirement cannot be met absent a real or immediate threat that the plaintiff will be wronged again, City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 1670 (1983), it is also well-established that injunctive relief is appropriate "to prevent a substantial risk of serious injury from ripening into actual harm," Farmer, 511 U.S. at 845, 114 S. Ct. at 1983. In such circumstances, the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent. Kapps v. Wing, 404 F.3d 105, 123 (2d Cir. 2005) ("[W]here a history of legal violations is before the district court, that court has significant discretion to conclude that future violations of the same kind are likely."); Thomas v. County of L.A., 978 F.2d 504, 508 (9th Cir. 1992) ("A state law enforcement agency may be enjoined from committing constitutional violations where there is proof that officers within the agency have engaged in a persistent pattern of misconduct."); Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir. 1980) (an inmate "does not need to wait until he is actually assaulted before obtaining

60

relief"). Thus, the fact that the underlying injunction only applies in the event that McKinney is transferred back to FSP, in itself, does not eliminate his need for protection from irreparable future harm. See Farmer, 511 U.S. at 850–51, 114 S. Ct. at 1986 (concluding that the fact that the petitioner had been transferred from an administrative segregation unit to the general prison population of a medium-security prison did not conclusively establish that there was no present threat of future injury so as to moot injunctive relief).

Additionally, despite the asserted absence of any present intention on the part of the defendants to return McKinney to FSP, the defendants stipulated at trial and have conceded on appeal that McKinney's return is indeed possible. In fact, the record establishes that the very purpose of McKinney's inpatient treatment at UCI is his stabilization and ultimate return to a non-therapeutic prison setting. See Thomas, 2009 WL 64616, at *6 (making the uncontested factual finding that the purpose of UCI's inpatient treatment of decompensated inmates is to stabilize them to S-3 status in order to transfer them back to their prior facility); id. at *14 (noting that the DOC's Consent to Inpatient Mental Health Care form (which was signed by McKinney on various occasions advises inmates that if they are transferred to an inpatient treatment center, "the length of stay in inpatient care will depend upon how quickly [their] condition improves, but is usually no longer than four (4)

61

weeks in a Crisis Stabilization Unit, three months in a Transitional Care Unit, or four (4) days in a permanent institution infirmary").[30]  Furthermore, as the district court noted, "during this litigation, just days after DOC announced that it had no present intention of returning certain plaintiff inmates back to FSP, the DOC transferred one of them back to FSP."  Id. at *11.  Notably, but for this litigation and the defendants' expert Dr. Hall's review of McKinney's inmate file in preparation for trial, which led to his most recent transfer to UCI, it is likely that McKinney would remain incarcerated at FSP today.

In light of the record, which chronicles the many years in which McKinney experienced frequent psychological emergencies, cycles of decompensation and stabilization, and simultaneous sprayings with chemical agents, and the DOC's undisputed policy to return stabilized inmates to their original institution, the likelihood that McKinney will be returned to FSP and again subjected to the

---

[30]  There are plainly exceptions to this generalization, as evidenced by plaintiff Thomas's lengthy stay at UCI following a week in which he was sprayed with chemical agents every day of the week save one, resulting in second and third-degree burns.  See Thomas, 2009 WL 64616, at *13.  Dr. Infante, the UCI psychiatrist who treated Thomas following these incidents, testified that "it seemed like forever" before she was able to stabilize him, and Thomas spent over six months in a crisis stabilization unit and almost nine months at UCI before he was returned to FSP.  Id.  It was only two days after his return that Thomas was again sprayed with chemical agents for causing a disturbance on his wing, and only one week until he was transferred back to UCI for treatment.  Id.  However, DOC policy establishes that lengthy UCI stays are not the norm, and Thomas's experience illustrates that even following months of treatment and a difficult stabilization process, the goal is for all inmates' ultimate return to their prior institutions.

DOC's non-spontaneous use-of-force policy is neither speculative nor unlikely. Additionally, the DOC's historical treatment of McKinney gives rise to an inference of future irreparable injury justifying the entry of injunctive relief.

Second, the defendants make the related argument that McKinney's incarceration at UCI prevents him from establishing a "current and ongoing" violation under the PLRA. See 18 U.S.C. § 3626(b)(3) (providing that "[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right"). Although the defendants recognize that this provision of the PLRA governs termination proceedings (whereas we are reviewing the district court's initial entry of injunctive relief), they argue that the "current and ongoing" violation requirement should inform our inquiry here.

The defendants' only authority for this proposition is a statement made in dicta by the Ninth Circuit that "the standard for termination does not differ materially from the standard to be applied in deciding whether prospective relief is proper." Hallett v. Morgan, 296 F.3d 732, 743 (9th Cir. 2002). We are not persuaded that the Ninth Circuit's comment is apposite to this case; that comment was made in the different context of the court's review of a grant of a motion to terminate injunctive relief. Our circuit has previously recognized that the "current

63

and ongoing" requirement is distinct from the standard governing the initial entry of injunctive relief. See Cason v. Seckinger, 231 F.3d 777, 784 (11th Cir. 2000) ("[A] 'current and ongoing violation' is a violation that exists at the time the district court conducts the § 3626(b)(3) inquiry, and not a potential future violation."). Additionally, there is no indication in the PLRA, its legislative history, or the case law to suggest that the "current and ongoing" requirement was intended by Congress to amend the well-established law that injunctive relief is available in the first instance "to prevent a substantial risk of serious injury from ripening into actual harm," i.e., to prevent future harm. Farmer, 511 U.S. at 845, 114 S. Ct. at 1983. The PLRA's need-narrowness-intrusiveness limitation governs the initial entry of an injunctive relief in prison litigation cases. 18 U.S.C. § 3626(a)(1)(A). Whether there is a "current and ongoing" constitutional violation sufficient to avoid termination of the current injunction is a matter to be considered upon motion by either party in a termination proceeding, at least two years after the district court's initial award of relief. 18 U.S.C. § 3626(b)(3).

Third, the defendants contend that the DOC's recent reforms have rendered the awarded injunctive relief unnecessary. The defendants point to the additional training in assessing the behavior of inmates that is now provided to corrections officers working in close-management wings, the increase in mental health staff,

64

and the DOC's discontinuance of the most harmful chemical agent previously employed at FSP. We have recognized that "[s]ubsequent events, such as improvements in the allegedly infirm conditions of confinement, while potentially relevant, are not determinative" of whether injunctive relief is no longer warranted. LaMarca, 995 F.2d at 1541. This is especially true "[w]hen a defendant corrects the alleged infirmity after suit has been filed," id., "for practices may be reinstated as swiftly as they were suspended,"[31] Gates, 501 F.2d at 1321. The defendants filed this lawsuit in September of 2004, and many of the relied-upon reforms were enacted as recently as July 31, 2008.[32] See Thomas, 2009 WL 64616, at *28 n.51. Thus, to rely on intervening events occurring after suit has been filed the defendants must satisfy the heavy burden of establishing that these such events "have completely and irrevocably eradicated the effects of the alleged violations." LaMarca, 995 F.2d at 1542 (internal quotation and citation omitted).

Although the DOC's recent reforms may represent affirmative responses to

---

[31] The district court noted that the record establishes that multiple policy reforms had been instated and subsequently discontinued by the DOC in the past decade. See Thomas, 2009 WL 64616, at *29. The DOC instated a universal policy that all uses of force be videotaped, only to subsequently provide a large exception for FSP. Id. The DOC also completely discontinued its prior practice of providing medical staff with a list of inmates at risk of decompensation from exposure to chemical agents. Id.

[32] Although some reforms, such as the Osterback training intended to teach corrections officers to identify signs of acute mental illness, may have been in effect prior to suit, the defendants have not proffered any evidence to that effect. See Thomas, 2009 WL 64616, at *9 n.28.

65

recognized deficiencies in its ability to address the needs of its growing mentally ill inmate population, see Thomas, 2009 WL 64616, at *9–11, the defendants have not established that they have eradicated the effects of the constitutional violations found by the district court. Indeed, there has been no substantial change to the crucial aspect of the non-spontaneous use-of-force policy that led to the constitutional deficiency found by the district court. See Fla. Admin. Code Ann. r. 33-602.210(17)(n), (o). The policy still applies to all S-3 inmates, regardless of their mental health history. Nor has the DOC adopted the recommendations of the Florida Correctional Medical Authority to instate a pre-use-of-force mental-health evaluation for S-3 inmates. See Thomas, 2009 WL 64616, at *8. Also, the record calls into question whether the Osterback training has had any success in training corrections officers to differentiate symptoms of mental illness from pure recalcitrance. See id. at *9 & n.53 (summarizing testimony of Sergeant Keith Musselman, a correction officer receiving the Osterback training, who admitted to being unable to distinguish between recalcitrance and acute signs of mental illness, even after receiving the training). And Dr. Burns testified specifically that security staff would be unlikely to view McKinney's behavior as a symptom of acute mental illness because of his reputation of being "bad and disruptive." Id. at *26. Additionally, as the district court pointed out, the addition of transitional dorms for

"frequent-flier" inmates transferred between FSP and UCI still leaves to the discretion of security staff monitoring the N-Dorm, which houses newly returned inmates to FSP, whether to use chemical agents or call mental health for consultation. Id. at *29. Furthermore, no recent reform addresses the lack of access of any corrections staff, whether trained in crisis intervention or not, to an inmate's mental health records. Id.

In light of the DOC's history of constitutional violations and its failure to give "any express assurance" that McKinney will not be exposed to the use of chemical agents merely because he is exhibiting symptoms of his mental illness in the future, these reforms are insufficient to eliminate the need for injunctive relief. See Offner v. Shell's City, Inc., 376 F.2d 574, 576 (5th Cir. 1967) ("In view of such past history and the failure of Shell's to give any express assurance that Offner will not be deprived of the services and facilities of the restaurant in the future, we cannot say that the case is moot."). Thus, the district court did not abuse its discretion in determining that the defendants failed to demonstrate that the DOC "would not return to its former, unconstitutionally deficient state." See LaMarca, 995 F.2d at 1541 ("[A] court may nevertheless grant injunctive relief unless the defendant shows that absent an injunction, the institution would not return to its former, unconstitutionally deficient state.").

67

Nor are we persuaded by the defendants' final argument that the injunction is unnecessary because McKinney already has an adequate remedy at law to address the violation of his rights. See U.S. Army Corps of Eng'rs, 424 F.3d at 1128. The plaintiffs already settled their damages claims against the individual officers utilizing chemical agents prior to trial. The underlying injunctive relief is designed to remedy not individual wrongdoing on the part of an officer but McKinney's continued exposure to the DOC's non-spontaneous use-of-force policy as a condition of his confinement at FSP. No remedy at law will provide protection for McKinney from this unconstitutional condition of confinement in the future, nor will any monetary relief protect against future irreparable injury. The defendants' suggestion that the plaintiffs wait until a future violation arises would result in unnecessary and costly duplicative litigation. In sum, the district court did not abuse its discretion in concluding that injunctive relief was warranted and necessary to remedy the identified violation of McKinney's Eighth Amendment rights.

ii.    Workability, Scope, and Intrusiveness

The district court's permanent injunction reads as follows:

In the event that plaintiffs Jeremiah Thomas or Michael McKinney are placed in the Florida State Prison (FSP) Close Management (CM) wing, defendants Walter McNeil, as Secretary of the Florida Department of Corrections, and Randall Bryant, as Warden of the

68

Florida State Prison, in their official capacities, are enjoined from allowing the nonspontaneous application of chemical agents to plaintiffs Thomas or McKinney without first consulting with DOC's trained mental health staff so that a mental health professional can determine whether the application of the chemical agents is dangerous to the inmate's wellbeing, likely to exacerbate the current crisis or whether, on account of mental illness, the inmate is currently unable to conform his conduct to comply with the directives being given to him by correctional staff. Once contacted, the mental health professional will use his or her professional judgment to determine whether the non-spontaneous use of chemical agents is contraindicated for that inmate at that time (similar to the prior consultations which now occur with medical staff before non-spontaneous application of chemical agents is permitted). If, after consultation, the mental health professional deems the use of chemical agents to be contraindicated, chemical agents may not be employed at that time.

Thomas, 2009 WL 605306, at *2. The defendants make two specific arguments that this injunction is unworkable and then make two conclusory arguments with respect to the scope and intrusiveness of the injunction. We first address their two specific arguments: that the injunction deprives the DOC of any means to "stop an undisputed danger to the prison and its employees" and mandates a "cell front" consultation that will blur the line between mental health analysis and security measures to the detriment of McKinney. These challenges to the workability of the district court's injunction are based on significantly mistaken premises.

First, contrary to the defendants' bald assertion that the injunction leaves them with no constitutionally permissible way to stop a disturbance endangering an officer or inmate, the injunction does no such thing. If there is an immediate

69

danger, the injunction has no effect at all. The injunction addresses only non-emergency situations and only the DOC's non-spontaneous use-of-force policy. Even in such non-emergency situations—by definition allowing for time for the mental health consultation—the injunction leaves the ultimate decision as to the non-spontaneous use of chemical agents to the discretion of DOC personnel. The injunction merely requires participation of a mental health professional in that decision.

Second, the defendants assume that the injunction mandates cell-front mental health evaluations. This claim is puzzling, in light of the district court's express statement in its order awarding injunctive relief that the decision whether or not to use a cell-front procedure is left to the discretion of the DOC. See id. at *2 n.4 ("This required prior consultation with mental health staff may or may not lead to the mental health professional going cell front to speak to the inmate. This is left to the judgment of the mental health professional and security staff in the given situation.").

Also related to the workability of the injunction is the defendants' assertion throughout their briefs that the non-spontaneous use of chemical agents on inmates is the least harmful alternative available to the defendants to respond to a prison disturbance. We also reject this assertion. The defendants compare the use of

70

chemical agents to the allegedly much more dangerous use of physical cell extractions, which have resulted in inmate death in the past. In doing so, however, The defendants fail to recognize that there are less harmful means of administering chemical agents. As previously noted, the CMA has repeatedly recommended the inclusion of a pre-use-of-force consultation with mental health professionals. See Thomas, 2009 WL 64616, at *8. The Federal Bureau of Prisons has already adopted such a policy. See id. UCI functions without the routine use of chemical agents as a means of enforcing prison discipline; instead, mental health staff intervenes, using a technique similar to the district court's injunction. Id. at *5. Moreover, the UCI experience indicates that the cooperation between mental health and security staff occurs without implicating the defendants' stated concern that inmates will confuse doctors with corrections staff, creating an environment of distrust. Id. at *10.

Having rejected the defendants' specific challenges to the workability of the injunction, we turn next to their conclusory arguments that the injunction extends further than necessary to correct the violation and is overly intrusive. The defendants do not articulate any particular aspect of the injunction that they claim extends beyond the violation found by the district court or is overly intrusive. It is of course true that the case law has long established that the scope of an injunction

should not exceed the identified violation.  See Califano, 442 U.S. at 702, 99 S. Ct. at 2558; LaMarca, 995 F.2d at 1543.  It is also true that the PLRA only permits the entry of injunctive relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  The district court was keenly aware of these requirements and seemingly has fashioned a narrow injunction targeting the violation of McKinney's constitutional rights in a most non-intrusive manner.  See Thomas, 2009 WL 605306, at *1.  In light of the defendants' failure to articulate any specific deficiency in this regard, and in light of our observations below, we cannot conclude that the district court abused its discretion in fashioning the injunctive relief in this case.[33]

---

[33]    Especially in light of the defendants' failure to assist the district court in fashioning the equitable relief in this case, we hold that all arguments relating to the underlying injunction not raised specifically by the defendants on appeal are deemed abandoned.  For example, the defendants do not specifically argue that the district court erred by not making the required particularized findings that the proposed injunction satisfies the PLRA's need-narrowness-intrusiveness requirement.  See Johnson v. Breeden, 280 F.3d 1308, 1326 (11th Cir. 2002) (reading § 3626(a)(1)(A) of the PLRA as requiring a district court to "discuss [the need-narrowness-intrusiveness] factors and enter findings that are as specific to the case as the circumstances permit"); Oluwa v. Gomez, 133 F.3d 1237, 1239 (9th Cir. 1998) ("[B]efore granting prospective injunctive relief, the trial court must make the findings mandated by the PLRA.").  But see Gates, 376 F.3d at 336 n.8 (holding that § 3626(a)(1)(A), unlike § 3262(b)(3), does not require such written findings).  Because this issue is abandoned, we need not decide whether the district court's order satisfied our circuit's interpretation of § 3626(a)(1)(A).

In any event, the district court was clearly sensitive to the necessity to make the need-narrowness-intrusiveness findings.  The court cited § 3626(a)(1)(A) and quoted its relevant language.  The court lamented the defendants' refusal to assist the court with proposals for the injunction, noting that DOC officials would be in the best position to suggest the least intrusive means of remedying the constitutional violation.  Then the court acknowledged that it

We first reject the defendants' conclusory argument that the district court's injunction extends beyond the identified constitutional violation. To the contrary, we conclude that its scope is exceedingly narrow. The district court held that the DOC violated the constitutional rights of only two inmates, and the injunction now, due to Thomas's death, governs the DOC's treatment of only one inmate out of thousands housed at FSP. The injunction also only targets the narrow constitutional violation identified by the district court. The district court did not hold that it is categorically unconstitutional to administer chemical agents on FSP inmates with diagnoses of serious mental illness. Nor is it categorically unconstitutional to administer chemical agents on FSP inmates with a history of transfers between FSP and UCI. Rather, it is only the repeated spraying of inmates with such profuse and pathological records of psychological distress—at times in that they were exhibiting undeniable symptoms of their mental illnesses rendering them unable to understand and comply with officers' orders—that violated the Eighth Amendment. Accordingly, the district court's injunction does not prohibit

nevertheless had a duty to fashion appropriate injunctive relief, obviously with reference to the needs-narrowness-intrusiveness requirement just quoted. Moreover, as indicated in the text below, the district court's order demonstrates that it plainly strove to satisfy those requirements in fashioning the injunctive relief awarded McKinney. Had the defendants objected in the district court to a failure to expressly articulate the need-narrowness-intrusiveness findings or argued that such express findings were required, it is clear from the record that the district court would have made these findings.

all non-spontaneous use of chemical agents on McKinney but merely requires that the DOC's trained mental health staff evaluate his psychological state prior to authorizing such force.

Moreover, the district court refrained from entering any system-wide relief protecting a broader class of inmates despite the CMA's recommendation that the DOC adopt some form of mental health consultation prior to a use of non-spontaneous force on all S-3 inmates. Compare Gomez v. Vernon, 255 F.3d 1118, 1130 (9th Cir. 2001) ("The district court properly limited its injunction to a combination of prospective and retrospective relief granted to just six inmates, denying class-wide injunctive relief.") with Lewis v. Casey, 518 U.S. 343, 358–59, 118 S. Ct. 2174, 2183–84 (1996) (holding that system-wide relief was inappropriately tailored to protect against violations of one inmate's rights). In this regard, the injunction appropriately balances respect for the DOC's administration of its own affairs with the need to ensure that McKinney is not further subjected to the DOC's non-spontaneous use-of-force policy without regard for his mental health history or current mental state. In sum, we conclude that in addition to being closely tethered to the identified harm, the district court plainly adhered to the PLRA's requirements that injunctive relief be "narrowly drawn" and extend "no further than necessary" to correct the violation of a constitutional right. 18 U.S.C.

§3626(a)(1)(A).

We also reject the defendants' conclusory argument that the injunction is overly intrusive. Our review of the injunction's terms demonstrates that its terms are most non-intrusive and thus satisfy the PLRA's final requirement. The injunction leaves to the complete discretion of the DOC both how to conduct the required pre-use-of-force mental health consultation and whether the non-spontaneous use of chemical agents is ultimately appropriate. To ensure that the injunction does not excessively impede upon the DOC's internal administration, the district court borrowed language from the DOC's current policy requiring a medical consultation prior to the use of non-spontaneous force and an existing DOC regulation entitled "Use of Force with Mentally Disordered Inmates." Fla. Admin. Code Ann. r. 33-404.107(1). This regulation provides that in non-emergency (that is, "non-spontaneous") situations, force may be used on "those inmates with a diagnosed mental illness only as a last resort" except where "the use of force is less likely to result in physical injury to the inmate and staff."[34] Id. In emergency situations in which there is an "imminent threat of bodily harm to the inmate or others," force may be used on inmates with mental illness, although

---

[34]     As the district court noted, the parties did not put on any evidence as to how this policy is currently implemented. Thomas, 2009 WL 64616, at *2 n.9.

"when time and circumstances permit, medical and mental health care staff shall be consulted to assess if the force to be used is dangerous to that inmate's well-being, or likely to exacerbate the current crisis." Id. Additionally, the DOC already requires a post-use-of-force evaluation. See Fla. Admin. Code Ann. r. 33-602.210(17)(o)(5) ("Mental health staff shall evaluate the inmate not later than the next working day, to determine whether a higher level of mental health care (isolation management, transitional or crisis stabilization) is indicated.").

Furthermore, multiple experts, including Drs. Infante and Burns, as well as the former warden of FSP, Ronald McAndrew, all testified to the feasibility of a pre-use-of-force mental health consultation. And according to McAndrew the number of uses of chemical agents actually dropped dramatically during his tenure as a result of this intervention. Chase Riveland, the plaintiffs' correctional systems expert, also testified that many state prison systems—in addition to the Federal Bureau of Prisons—already require mental health intervention before chemical agents are used.

Finally, as the district court pointed out in its order, the injunction will require little to no additional expenditures on the part of the DOC, as it already employs a large number of mental health professionals on the close-management wings of FSP who could be available to assist in evaluating McKinney. Nor does

the injunction require onerous continuous supervision by the court or judicial interference in running FSP. Cf. Lewis, 518 U.S. at 362, 116 S. Ct. at 2185 (vacating district court's injunction that was "inordinately—indeed, wildly—intrusive" because it micro-managed the minutiae of prison operations); LaMarca, 995 F.2d at 1543 (vacating injunction that detailed the methods by which the defendants must effectuate their policies of disciplining guards because it unnecessarily intruded upon the prison's operations). This injunction merely requires that the DOC post a notice of the injunction on McKinney's cell door, notify the district court and opposing counsel when McKinney is returned to FSP and of any non-spontaneous use-of-force on McKinney, and videotape all such incidents, as is already required under DOC policy. See Fla. Admin. Code Ann. r. 33-602.210(5)(b) ("The administration of chemical agents on an inmate creating a disturbance in his or her cell when the officer is attempting to resolve the situation without extracting the inmate from the cell will also be video recorded.").[35] Far from abusing its discretion, the district court apparently went to great efforts to accommodate and complement the DOC's current regulatory structure despite the DOC's unwillingness to assist the court in fashioning the most appropriate relief.

---

[35] There is one exception to this policy: videotaping is not required if an inmate stops his disruptive behavior at the sight of the video camera but then resumes it once the videotaping officers leave, a process referred to as "gaming" the system. Fla. Admin. Code Ann. r. 33-602.210(5)(b)(2).

In sum, creating an additional requirement that corrections staff consult with mental health staff prior to spraying McKinney with chemical agents adds but one layer to a long list of existing prerequisites to the use of non-spontaneous force at FSP that will at most affect only a few isolated decisions over the course of McKinney's future incarceration. See Gomez, 255 F.3d at 1130 (upholding the scope of an injunction that would at most affect "a few isolated decisions over the course of the[] inmates' sentences"). Accordingly, while "[c]onstantly mindful that the federal courts should not undertake to run the prison," we conclude that the remedial measures ordered by the district court neither require "burdensome implementation" nor are they "beyond the remedial jurisdiction of the district court." Gates, 501 F.2d at 1310. To the contrary, the district court's injunction merely constructs the "minimal foundation" for ensuring McKinney's future confinement at FSP does not run afoul of the Eighth Amendment. See id. For the foregoing reasons, we reject the defendants' arguments that the district court abused its discretion in entering the underlying injunction and uphold the district court's award of injunctive relief to McKinney.

IV. CONCLUSION

We conclude that the district court did not err in granting a declaratory judgment in favor of McKinney on his Eighth Amendment conditions-of-

confinement claim. We also conclude that the district court did not abuse its discretion in entering the instant injunction. Accordingly, with respect to McKinney, the judgment of the district court is affirmed.[36]

AFFIRMED.

---

[36] Due to his death, the injunction with respect to Thomas is vacated, and the matter is remanded to the district court with instructions to dismiss his motion for an injunction as moot. However, we grant the motion for substitution filed by Thomas's father in order to allow the district court to resolve Thomas's pending motion for attorney's fees.